IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| IN RE: LUMBER LIQUIDATORS CHINESE-MANUFACTURED FLOORING PRODUCTS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL No. 1:15-md-2627 (AJT/TRJ) |

This Document Relates to ALL Cases

| | |
|---|---|
| IN RE: LUMBER LIQUIDATORS CHINESE-MANUFACTURED FLOORING DURABILITY MARKETING AND SALES PRACTICE LITIGATION | MDL No. 1:16-md-2743 (AJT/TRJ) |

This Document Relates to ALL Cases

## ORDER

These matters are before the Court on Plaintiff's Motion for Attorneys' Fees, Costs, Expenses, and Service Awards to Class Representatives [Doc. 1644]. For the reasons stated below, the Court will award reasonable attorneys' fees in the amount of $10,080,000, or 28 percent of the $36 million common fund, reasonable costs and expenses in the amount of $797,397.45, leave to pay the costs of notice and administration not to exceed $1,194,500, and twelve service awards of $5,000 to each named Plaintiff in both matters.

### I. BACKGROUND

#### A. **Procedural History**

The Settlement arises out of Defendant's sale of laminate flooring products to more than 760,000 customers from 2009 to 2015. In March 2015, Plaintiffs, all of whom purchased the flooring products at issue, began filing law suits across the United States in both federal and state

courts alleging that Defendants falsely stated that the flooring complied with the California Air Resource Board's ("CARB") maximum acceptable limits of formaldehyde emissions. [Doc. 1618 at 9–10].

In June 2015, the United States Judicial Panel on Multidistrict Litigation consolidated the pending federal cases and transferred them to this Court, where it proceeded in this Court as Case Number 1:15-md-2627 and has been referred to by the parties as the "Formaldehyde Litigation." [Doc. 1]. After this Court granted in part and denied in part Defendant's motion to dismiss, the case proceeded to discovery, which involved the production of voluminous documentation and depositions of twenty-six fact and ten expert witnesses. *See* [Doc. 1618-3 at 4]. The parties completed fact discovery in early 2016. *See* [Doc. 878]. In August 2016, Defendant moved for summary judgment in the Formaldehyde Litigation. [Doc. 999]. The Court granted in part and denied in part that summary judgment motion. *See* [Docs. 1090, 1091].

In May 2015, purchasers of the same laminate flooring as in the Formaldehyde Litigation filed a proposed class action in the United States District Court for the Central District of California, alleging that Defendant also falsely claimed that the flooring at issue in the Formaldehyde Case met various international and industry durability standards. [Doc. 1618 at 12–13]. The California District Court ordered all plaintiffs who were not California residents to refile individual cases in their home federal districts. [Doc. 1618 at 13]. In response, those plaintiffs filed individual actions in thirty-one federal districts throughout the United States. [Doc. 1618 at 13]. In October 2016, the Judicial Panel on Multidistrict Litigation consolidated those cases and transferred them to this Court, where it has proceeded as Case Number 1:16-md-2743 and has been referred to by the parties as the "Durability Litigation." [Doc. 3]. Thereafter, discovery commenced in the Durability Litigation. Plaintiffs conducted thirteen fact depositions

2

and reviewed voluminous documents produced before the Court stayed discovery for purposes of mediation on August 17, 2017. [Doc. 1618 at 14].

After mediations in December 2015 and July 2016 and protracted settlement discussions throughout the latter part of 2016 and most of 2017, the parties in both MDLs agreed on October 23, 2017 to key settlement terms and entered into a Memorandum of Understanding to settle both cases in their entirety. *See* [Doc. 1618 at 14–16]. After additional negotiations to finalize the terms of settlement, the parties submitted the Settlement to this Court for preliminary approval on March 15, 2018. [Doc. 1339]. On June 15, 2018, the Court conditionally certified the two classes proposed in the Settlement, gave the Settlement preliminary approval and approved the parties' plan to notify the class of the Settlement's terms. [Doc. 1524]. Pursuant to the notice plan, the Court-appointed Claims Administrator began sending out over one million emails and postcards, together with online banner ads to notify class members of the Settlement. *See* [Doc. 1618-2 at 3–5]. The Claims Administrator also established a toll-free hotline and website for potential class members. [Doc. 1618-2 at 5–6]. Overall, approximately 73 percent of the class received notice through these efforts. [Doc. 1618 at 18–19]. On October 3, 2018, the Court held a hearing on whether to approve the Settlement, and by Order dated October 9, 2018, overruled the objections and approved the Settlement. [Doc. 1705]. As of the date the Court approved the Settlement, of the approximately 760,000 class members, 178,859 had filed claims pursuant to the Settlement. [Doc. 1688 at 12]. Ninety-four class members had opted out of the Settlement, and twelve class members filed objections to it. [Doc. 1688 at 7].

B. **The Settlement**

In exchange for a release of all claims by class members in both the Formaldehyde and Durability Litigations, Defendant will create a non-reversionary fund consisting of $22 million in

3

cash and $14 million in store-credit vouchers, for a total settlement amount of $36 million. [Doc. 1618-1 at 16].

Because the formaldehyde emissions levels allegedly varied during different time periods, the Settlement places class members into two classes. The first class (the "CARB1 Class") consists of customers who purchased a certain type of laminate flooring from Defendant between January 1, 2011 and May 31, 2015, and the second class (the "CARB2/Durability Class"), a much larger group, consists of customers who purchased the same type of flooring between January 1, 2009 and December 31, 2010. *See* [Doc. 1618-1 at 18–21].

The formaldehyde emissions levels during the time that the CARB2/Durability Class purchased the flooring were allegedly much higher than during the time in which the CARB1 Class customers purchased it, thus making the CARB2/Durability Class's claims stronger. [Doc. 1618 at 16 & n.7]. The benefits to be received by the two classes reflects this difference, as well as the overall priority to provide a realistic opportunity for class members exposed to the higher level of formaldehyde emissions to replace their flooring.

Class members in the CARB1 Class, the class of purchasers who were allegedly exposed to lower formaldehyde emissions than the members of the CARB2/Durability Class, may make a claim for an expected $50 cash award. *See* [Doc. 1618 at 17]. However, only $1 million of the settlement fund will be set aside for the CARB1 Class; thus, the award will be reduced proportionally if the claim participation rate exceeds estimates. [Doc. 1618 at 17–18].

Members of the CARB2/Durability Class have the option to choose between a cash payment or vouchers. [Doc. 1618 at 17]. The initial deadline to make the selection was October 13, 2018. [Doc. 1618-2 at 7]. The vouchers are redeemable for up to three years after the settlement date, or longer if state law requires it, and are transferrable to a designated family

4

member or charity elected by the eligible member. [Doc. 1618 at 17]. Voucher awards are based upon the class members' claim amount, while the cash payments are awarded *pro rata*. [Doc. 1618 at 17]. Vouchers are not available to class members in the CARB1 Class. [Doc. 1618 at 17].

Initial estimates predicted that class members who receive vouchers would receive value in the amount of between 50 and 134 percent of their original purchase price, while class members who receive cash would receive between 28 and 72 percent. [Doc. 1618 at 24]. The notice plan informed class members that they would likely receive between 20 and 56 percent of their purchase price if they chose the cash award and between 38 and 104 percent if they chose the vouchers. [Doc. 1688-2 at 2]. However, due to an actual participation rate double that of the initial estimates, current calculations indicate that those who elect the cash award will receive approximately 5.5 percent of their purchase price, and those who elect vouchers will receive approximately 59 percent. [Doc. 1688 at 3]. Accordingly, in its Order approving the Settlement, the Court extended the deadline for class members to make their selections to October 20, 2018, in order to allow class members to reconsider their selections in light of the updated estimates. [Doc. 1705 at 18].

The Settlement authorizes lead counsel to seek an award of attorneys' fees "of up to 33.33% of the Settlement fund." [Doc. 1618-1 at 33]. It also authorizes counsel's actual costs and expenses, administrative expenses, and twelve service awards of $5,000 each to be paid to the representative Plaintiffs in both matters. [Doc. 1618-1 at 33, 34].

Plaintiffs moved for an award of fees, costs, and expenses on August 18, 2018. [Doc. 1619]. Lead counsel request (1) attorneys' fees in the amount of $11.16 million, or 31 percent of the $36 million Settlement; (2) reimbursement of reasonable costs and expenses totaling

$797,397.45 from the common fund; and (3) twelve service awards of $5,000 to each named Plaintiff or household in both matters. Plaintiffs request that all three of these awards be paid from the common fund. [Doc. 1644 at 1–2].

## II. LEGAL STANDARD

"[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). The Court has discretion to choose between the lodestar method and the percentage-of-fund method to determine an appropriate award of attorneys' fees in this common fund case. A court employing the percentage-of-fund method awards attorneys' fees as a percentage of the common fund. *Phillips v. Triad Guar. Inc.*, 2016 WL 2636289, at *2 (M.D.N.C. May 9, 2016). "The percentage of fund method operates similarly to a contingency fee arrangement in that the attorneys receive a percentage of the final monetary value obtained for their clients." *Jones v. Dominion Res. Servs., Inc.*, 601 F. Supp. 2d 756, 758 (S.D. W. Va. 2009). This method "has overwhelmingly become the preferred method for calculating attorneys' fees in common fund cases." *Id.* By contrast, the lodestar method requires the court to set a reasonable hourly rate and then multiply that rate by "the hours reasonably expended by counsel that created, protected, or preserved the fund." *In re MicroStrategy, Inc.*, 172 F. Supp. 2d at 786.

## III. ANALYSIS

The Court will employ the percentage-of-fund method and additionally will perform a "lodestar cross-check" to confirm the reasonableness of the percentage of fees requested. *See, e.g., In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 385 (D. Md. 2006); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005).

6

## A. Percentage-of-Fund Calculation

Courts commonly consider seven factors in establishing a reasonable percentage award in common fund cases: (1) the results obtained for the class; (2) objections by class members to the settlement or the proposed fee award; (3) the competency and efficiency of counsel in the course of the representation; (4) the complexity and duration of the matter; (5) the risk of nonpayment; (6) public policy factors; and (7) awards in similar cases. *E.g.*, *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 261 (E.D. Va. 2009); *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 733 (3d Cir. 2001); *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974).

### 1. *Results Obtained for the Class*

"[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Doe v. Chao*, 435 F.3d 492, 506 (4th Cir. 2006) (internal quotation marks omitted) (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)). Lead counsel obtained an award worth a total of $36 million in the face of significant legal challenges. *See* [Doc. 705 at 9–11 (discussing the procedural posture of both matters at the time of settlement)]. As discussed in its Order approving the Settlement, both classes had strong cases that survived preliminary legal challenges and presented a reasonable opportunity for success had the matters gone to trial; nevertheless, significant questions remained in both matters that could have potentially foreclosed recovery for the classes. [Doc. 1705 at 9–11]. Despite these uncertainties, for those class members who decide to replace their floors, the Settlement offers the opportunity to obtain a substantial portion of the cost they will incur to replace floors they purchased and used for several years. While class members in the CARB2/Durability Class who choose a cash payout (rather than a voucher for replacement costs) will receive a small fraction of their original purchase price, the Settlement has been reasonably fashioned in a way to provide the most relief

7

to those who are most likely to have been injured. While this smaller payout falls short of providing cash recipients with enough value to replace the floors they purchased from Defendant, it is also indicative of the success lead counsel achieved in constructing an effective notice program that reached a large percentage of prospective class members, which in turn ensured that a broad segment of the population who purchased the flooring products at issue will obtain some relief. The Court has also considered, and cannot ignore, the restraining realities on any settlement or recovery due to Defendant's financial ability to pay, as reflected in the structure of the Settlement that has allowed Defendant to use its product inventory to satisfy its voucher obligations. On balance, the Court finds and concludes that counsel obtained satisfactory results for both classes.

2. *Objections*

In an attempt to reach more than 760,000 potential class members, Plaintiffs sent over one million combined emails and postcards. *See* [Doc. 1618-2 at 3–5]. As of the time the Court approved the Settlement, approximately 178,000 had filed claims. [Doc. 1688 at 12]. At that time, ninety-four had opted out, representing an opt-out rate of approximately .05 percent of responders and .0127 percent of the potential class. [Doc. 1688 at 14]. Only twelve responders filed objections to the Settlement. [Doc. 1688 at 14]. Of those, only five objected to or raised concerns with the proposed award of fees and expenses. *See* [Docs. 1662, 1673, 1656, 1:16-md-2743 Docs. 140, 149]. This low objection rate suggests that the class as a whole accepts the proposed fee award. *In re The Mills Corp.*, 265 F.R.D. at 261.

Further, the Court has considered the objectors' arguments against counsel's fee award and finds them without merit. Four of the five objectors argue that the Court should not attribute $14 million to the voucher awards when analyzing the Settlement's value for purposes of

calculating reasonable attorneys' fees. *See* [Docs. 1656 at 1, 1673 at 2; 1:16-md-2743 Docs. 140 at 10–13, 149 at 2–5]. Those objectors argue that the vouchers do not represent benefits actually conferred on the class because they are unlikely to be redeemed and constitute "coupons" as the term is used in the Class Action Fairness Act (CAFA), which requires in relevant part that in coupon settlements, "the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed." 28 U.S.C. § 1712(a).

The Court rejects the objectors' arguments that the vouchers are unlikely to be redeemed. Class members chose vouchers voluntarily over the available cash award, and the vouchers are guaranteed, redeemable for three years, transferrable to family members, and carry an average value in the hundreds of dollars. Any class member who knowingly chose such vouchers yet fails to redeem them over the next three years would no more fail to receive a benefit "actually conferred" than a class member who receives a check yet fails to cash it.

Moreover, the vouchers awarded in the Settlement are not "coupons" under CAFA's definition of the term. Unlike a coupon, the vouchers of the type awarded in the Settlement are more akin to gift cards because they entitle the bearer to obtain Defendant's inventory at the same exchange rate as customers who purchase Defendant's flooring products with cash and do not require class members to make additional purchases with their own money in order to obtain the products eligible to be purchased with the vouchers. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 951 (9th Cir. 2015); *see also Reibstein v. Rite Aid Corp.*, 761 F.Supp.2d 241, 255–56 (E.D. Pa. 2011) (finding that Rite Aid gift cards were not coupons under CAFA because, among other reasons, they held "actual cash value"). Therefore, counsel's request for the Court to consider the full $14 million cash value in calculating the fee award is appropriate.

9

*See, e.g., CLRB Hanson Indus., LLC v. Weiss & Assocs., PC*, 465 F. App'x 617, 619 (9th Cir. 2012) ("The settlement gives every class member the option to receive its share of the settlement in cash . . . . This is not a 'coupon settlement' and therefore does not trigger the Class Action Fairness Act of 2005's limitations on contingent fee awards in connection with such settlements."); *Lee v. Enter. Leasing Co.*, 2015 WL 2345540, at *3 (D. Nev. May 15, 2015) (holding that a settlement that awarded benefits to class members in the form of vouchers was "not a coupon settlement" and thus did not require "heightened scrutiny under [CAFA]").

Finally, one objector argues that counsel have not provided billing records specific and detailed enough to allow the Court to perform a thorough lodestar analysis. [Doc. 140 at 9–10]. However, the Court will employ the percentage-of-fund method and will employ a lodestar computation as a "cross-check" of the fee award; thus, the Court need not exhaustively scrutinize counsel's records to the exacting degree it would if it were to employ the lodestar method in calculating a reasonable fee award. *See, e.g., Thomas v. FTS USA, LLC*, 2017 WL 1148283, at *6 (E.D. Va. Jan. 9, 2017), *report and recommendation adopted*, 2017 WL 1147460 (E.D. Va. Mar. 27, 2017); *Jones*, 601 F. Supp. 2d at 765; *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000). The Court has reviewed the records submitted by counsel and concludes that those records are sufficient to allow meaningful review for purposes of calculating a lodestar cross-check multiplier.

Accordingly, the Court concludes that the low number of objections to the requested fee award and the lack of merit therein do not support a finding that the requested percentage award is unreasonable.

### 3. *Competency and Efficiency of Counsel*

As discussed, counsel navigated both matters through the litigation process, argued several successful motions, engaged in lengthy and ultimately successful negotiations during the mediation process, and aided in the construction of a notice program that resulted in class-participation rates that exceeded expectations. Thus, there is no suggestion that lead counsel performed incompetently or inefficiently during the course of this litigation. Indeed, every indication suggests that they consistently performed to a high standard.

### 4. *Complexity and Duration of the Litigation*

Lead counsel are highly experienced in the field of multidistrict litigation, and they achieved satisfactory results for the classes in these matters. *See supra* Part III.A.1. Both matters involved hundreds of consolidated claims brought throughout the United States, and both matters, particularly the Formaldehyde Litigation, continued for multiple years in this Court before settlement. Moreover, class actions like those involved in these matters are some of the most complex cases of any litigation type.

### 5. *Risk of Nonpayment*

As discussed, although both classes likely had strong cases had the matters proceeded to trial, significant questions as to class certification and proof of damages remained, which could have potentially derailed both cases. *See* [Doc. 1705 at 9–11]. Moreover, Defendant's uncertain financial situation during the course of this litigation suggests that counsel faced at least a substantial risk of nonpayment. After CBS aired an investigative report on Defendant's flooring on its *60 Minutes* program, Defendant saw its stock price decline from a high of $114.19 per share in October 2013 to an August 2018 price of $17.31 per share, destroyed millions of dollars in suspect flooring inventory, paid sizable regulatory fines, faced financial uncertainty

considering that it sold approximately $824 million in flooring cast into doubt by the report, and almost certainly saw a marked decline in sales revenue as a result of this publicity. [Doc. 1618 at 28–29]. Accordingly, it appears that Defendant faced at least a considerable risk of bankruptcy during this time, which could have resulted in partial or complete nonpayment.

### 6. *Public Policy*

In considering the public-policy impact of the requested fee percentage, the Court observes that counsel played an integral role in obtaining relief for thousands of class members aggrieved as a result of Defendant's alleged mislabeling. Nevertheless, the Court has concerns over awarding nearly one-third of the common fund to lead counsel when the largest group among the classes—CARB2/Formaldehyde Litigation members who chose the cash award—will receive approximately 5.5 percent of their original purchase price. *See infra* Part III.A.1.

### 7. *Awards in Similar Cases*

Lead counsel's requested award of 31 percent of the common fund is higher than the median award in common fund cases, both nationwide and in the Fourth Circuit. A recent empirical survey indicated that percentage awards in common fund cases "are generally between 20–30%, with the average award hovering around 25%." 5 *Newberg on Class Actions* § 15:83 (5th ed. 2018) (footnote omitted). As to awards within the Fourth Circuit, the same study calculated a median award of 27.7 percent in common fund cases. *Id.* Among all Circuits, the median award exceeded 30 percent of the common fund in only the Seventh Circuit (31.6 percent). *Id.* Other surveys corroborate these estimates. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002) (finding similar medians in survey of awards in common fund cases from 1996 to 2001); Thomas E. Willging, Laural L. Hopper & Robert J. Niemic, *Empirical*

*Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 69 (1996) (reporting median awards between "27% to 30%").

While lead counsel cite common fund cases in which counsel received an award of one-third the common fund or greater, those cases involved settlements that were considerably smaller than the award in the Settlement currently before the Court. *See Thomas*, 2017 WL 1148283, at *2 (37.5 percent of $1.3 million common fund awarded); *Temp. Servs., Inc. v. Am. Int'l Grp., Inc.*, 2012 WL 13008138, at *6 (D.S.C. July 31, 2012) (one-third of $1.3 million common fund awarded). The Court's review of fee awards in common fund cases involving settlements in the same value range as the Settlement suggests that typical awards in such cases range from 20 to 30 percent. *See, e.g., Frederick v. Range Res.-Appalachia, LLC*, 2011 WL 1045665 (W.D. Pa. Mar. 17, 2011) (20.58% of $23 million common fund); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002) (22.5% of $44.5 million common fund); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 486 (S.D.N.Y. 1998) (surveying fee awards in class action settlements from $1 to $50 million and concluding that awards range from twenty to 30 percent, with a median of 25 percent); *Lazy Oil Co. v. Wotco Corp.*, 95 F. Supp. 2d 290, 342 (W.D. Pa. 1997), *aff'd sub nom., Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581 (3d Cir. 1999) (finding a typical fee award range of twenty to 27 percent in cases involving settlements of $20 to $30 million, and accordingly awarding a 28 percent fee award from an $18.9 million common fund). These results are consistent with the principle that as the size of the common fund increases, the size of the fee award as a percentage of the fund decreases, in order to avoid a windfall. *See Lazy Oil*, 95 F. Supp. 2d at 342. The Court finds this principle particularly appropriate here, where class members will receive a relatively small award in

13

comparison to their original purchase price and atypically large attorneys' fees will reduce their recovery even further.

Accordingly, while the Court acknowledges that comparison to awards in other cases is an incomplete method of assessing the reasonableness of the requested award because simple dollar-for-dollar comparison cannot account for individual factors in each case that may justify a lower or higher award than in previous cases, this factor, combined with consideration of the individual factors in the instant matters, suggests that an award of 31 percent of the common fund would be atypically high as compared to similar cases.

### B. Lodestar Cross-Check

In performing a lodestar cross-check, the Court calculates the award of attorneys' fees by "multiplying the number of hours reasonably worked by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer." *In re The Mills*, 265 F.R.D. at 264. The Court finds that the billing estimates totaling just short of 24,000 hours submitted by lead counsel are reasonable in light of the extensive litigation conducted in both matters and will therefore accept those estimates as submitted in calculating the lodestar multiplier. Multiplying those estimates by the requested average billing rate of approximately $524 per hour reveals an aggregate lodestar of nearly $12.5 million, which exceeds the $11.16 million award requested, resulting in a negative multiplier. This negative multiplier is much smaller than multipliers which have been found reasonable in similar cases. *See, e.g., Jones*, 601 F. Supp. 2d at 766 (collecting cases) ("Courts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee.").

Accordingly, the Court's lodestar cross-check supports the reasonableness of lead counsel's requested fee award of 31 percent.

## C. Costs

Additionally, lead counsel request reimbursement of costs and expenses totaling $797,397.45 from the common fund. [Doc. 1644 at 1]. "[C]osts, if reasonable in nature and amount, may appropriately be reimbursed from the common fund." *In re Microstrategy*, 172 F. Supp. 2d at 791. The costs counsel seek include, *inter alia*, court reporter fees, expert fees, document-reproduction costs, legal research, travel, supplies, and small amounts of overtime for hourly staff. *See, e.g.*, [Doc. 1646-2 at 2].

The Court has reviewed all of the declarations of lead counsel and finds and concludes that all of the costs and expenses requested to be reimbursed are reasonable and are directly related to litigation of these matters. Thus, the Court awards costs in the amount of $797,397.45 to be paid from the common fund.

## D. Service Awards

Finally, pursuant to the Settlement's terms, Plaintiffs seek twelve service awards of $5,000 each to each named Plaintiff in both matters. [Doc. 1620 at 26]. The Court finds and concludes that such awards are reasonable and therefore awards them to be paid from the common fund.

## IV. CONCLUSION

On balance, the various factors suggest that lead counsel's requested award of $11.16 million, or approximately 31 percent of the common fund would be slightly higher than reasonable. While a cross-check of the lodestar multiplier favors the requested fee, the fractional award of approximately 5.5 percent of the original purchase price to class members who choose

15

the cash award (the largest class by far) and the larger, yet still relatively conservative voucher award of fifty-nine percent, coupled with an assessment of typical awards in similar common fund cases, suggest that a reasonable award of 25 to 30 percent is appropriate. In light of the negative lodestar multiplier, an award toward the high end of this range is warranted. Accordingly, the Court finds and concludes that an award of 28 percent of the common fund is reasonable.

Accordingly, it is hereby

ORDERED that Plaintiff's Motion for Attorneys' Fees, Costs, Expenses, and Service Awards to Class Representatives [Doc. 1644] be, and the same hereby is, GRANTED to the extent that Plaintiffs are awarded reasonable attorneys' fees at the rate of 28 percent of the value of the Settlement reached in these matters; and it is further

ORDERED that Plaintiffs are awarded reasonable costs and expenses totaling $797,397.45, as well as leave to pay the costs of notice and administration not to exceed $1,194,500; and it is further

ORDERED that twelve service awards of $5,000 each shall be paid to each named Plaintiff or household in the Formaldehyde and Durability representative complaints; and the Motion is otherwise denied.

The Clerk is directed to forward copies of this Order to all counsel of record.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
November 15, 2018